[Crim. No. 1398. Fourth Dist. Mar. 9, 1959.]

THE PEOPLE, Respondent, v. DARRELL BROWN, Appellant.

Barton C. Sheela, Jr., under appointment by the District Court of Appeal, for Appellant.

Edmund G. Brown, Attorney General, and S. Clark Moore, Deputy Attorney General, for Respondent.

STONE, J. pro tem.*—An information was filed against defendant Darrell Brown, charging him and a codefendant

*Assigned by Chairman of Judicial Council.

Richard H. Wessilink with grand theft. The jury found both defendants guilty and the defendant Brown appeals from the judgment of conviction. The defendants were charged with the theft of approximately 600 pounds of lobsters of the value of $424. The lobsters were taken from four receiving tanks belonging to Stanley J. Lewis, and Gene Mierlot who, as partners, operated a commercial fishing business. The tanks were located in the kelp beds offshore near Cardiff, California, and were attached to a red or orange buoy which floated on the surface. Sometime prior to January 2, 1958, Brown and his codefendant Wessilink, while they were at sea on a fishing boat, met one Charles Whitney, a San Diego State College student and part-time fisherman. Whitney suggested to Brown and Wessilink that they sell their lobsters to a Mr. Busalacchi of the Union Fish Company in San Diego. On January 2, 1958, appellant and Wessilink arranged through Mr. Busalacchi to have Mr. Whitney meet with them. At the meeting they hired Mr. Whitney and his boat to take them to a position off Cardiff to collect lobsters for a consideration of $50. They met at Mission Bay around 7 p. m. and at that time Mr. Whitney was told that appellant was not going in the boat but would go to Cardiff by automobile. Mr. Whitney, Mr. John Pringle and Wessilink went in Whitney's skiff to an area off Cardiff. They located four receivers attached to red or orange buoys and unloaded two of the receivers into the boat. Mr. Wessilink said he believed there was some trouble on shore so they cut the tie lines to the remaining two receivers and loaded them aboard. Subsequently they unloaded the last two receivers and then threw them overboard. There were a number of undersized lobsters some of which were thrown overboard, although others were placed in sacks and handled in the same manner as the legal sized lobsters. They returned to Mission Bay and removed the sacked lobsters to a vacant lot. Mr. Whitney then called Joseph Busalacchi, owner of the Union Fish Market, and he and his son met defendant Wessilink and Whitney. The lobsters were sold to the Busalacchis and appellant signed a receipt using the name Joe Hogan. On January 3, 1958, Lewis and Mierlot discovered that their lobster receivers were gone and that the rope which had been attached to the receivers had been severed with a knife. Later that month Sergeant King of the sheriff's office of San Diego County had a conversation with Wessilink and appellant concerning the stolen lobsters and Wessilink stated that a Mr. Cromer had told him that the lobsters had come from Mexico

in Mr. Cromer's boat. Wessilink stated that Cromer's boat was in San Pedro so that Cromer was unable to handle the transportation of the lobsters and he sold them to him. Wessilink gave Sergeant King a receipt for the lobsters signed by Bob Cromer. Later examination disclosed that there were indentations on the receipt which showed that on two occasions other writings had been prepared over this receipt and that many of the words in these other writings were the same as those on the receipt, including the signature of Bob Cromer. The defendants did not produce Bob Cromer and an exhaustive search by an investigator for the district attorney's office failed to show any record of a Robert or Bob Cromer or Cramer.

Appellant specifies four grounds of error, the first being that the court erred in permitting impeachment of a defense witness by cross-examination concerning crimes with which the defendant and the witness had been charged but of which they had not been convicted. The questions asked defense witness Pangle concerned his previous arrest jointly with appellant for the illegal possession of lobsters. The witness admitted the arrest but up to the time of the trial, neither the witness nor the appellant had been convicted of the offense.

Conviction of the offense is not always a prerequisite to the introduction of evidence concerning another wrongful act.

In *People* v. *Raleigh*, 83 Cal.App.2d 435, 442 [189 P.2d 70], the court said:

"It is clear that under the rule of the foregoing authorities, evidence of defendant's prior possession of a gun, and the circumstances thereof, was admissible even though such evidence tended to show independent wrongful acts. It is contended, however, that even though such rule might apply under ordinary circumstances, it cannot apply where, as here, there was a court dismissal of the independent crimes shown. However, the rule is well settled in England as well as in this country that an acquittal (and of course a dismissal at the preliminary examination is not even as strong in effect as an acquittal) does not prevent the admissibility of the evidence."

The ultimate fact to be proved is the defendant's guilt of the crime with which he is charged and not the other offense. The evidence of the other offense is admissible even though the defendant was not convicted of it, provided such evidence is relevant. Therefore, the rule concerning the admissibility of other offenses expressed in the Raleigh case must be limited to those circumstances where the proof is relevant and mate-

rial to the crime for which the defendant is being tried. ██ The general rule of the admissibility of other criminal acts is stated in *People* v. *Sanders,* 114 Cal. 216, at page 230 [46 P. 153] :

"If the evidence of another crime is necessary or pertinent to the proof of the one charged, the law will not thwart justice by excluding that evidence, simply because it involved the commission of another crime. (*People* v. *Tucker,* 104 Cal. 440 [38 P. 195].) ██ The general tests of the admissibility of evidence in a criminal case are : 1. Is it a part of the *res gestae* ? 2. If not, does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense ? If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not." (See also *People* v. *Peete,* 28 Cal.2d 306 [169 P.2d 924] ; *People* v. *McMonigle,* 29 Cal.2d 730, 742 [177 P.2d 745] ; *People* v. *Sykes,* 44 Cal.2d 166, 170 [280 P.2d 769].)

██ The questions asked the witness Pangle concerning other offenses were material to the issues before the court. Appellant and his codefendant Wessilink set up as a defense the purchase of the lobsters from a Bob Cromer or Cramer contending they had no intent to steal the lobsters of Lewis or Mierlot. The defendants failed to produce Cromer and the evidence disclosed that a thorough search by the investigating staff of the district attorney failed to locate any such person. The witness Pangle on his direct examination gave credence to this defense by testifying that the day before defendants took the lobsters Pangle had seen a boat depositing lobster receivers in the same area. This gave some support to the defense theory that this other person was Bob Cromer and that he had deposited lobster receivers in the same area from which defendants had taken lobsters. No one else had seen receivers other than those of Lewis and Mierlot in the vicinity prior to the theft.

The prosecution by cross-examination was thus inquiring about the witness's association with the defendant Brown to show that they had been in the lobster business together and had been arrested and charged with violating the law regarding lobsters. The evidence was pertinent to show possible bias on the part of the witness and to explain a motive for his testimony which gave substance to the mythical Mr. Cromer.

The evidence also tended to refute defendant Brown's inference that he was a novice at the lobster business. (*People* v. *Thomson*, 92 Cal. 506, 509 [28 P. 589].)

■ The second error charged is that, over objection, the court permitted the district attorney to cross-examine appellant's codefendant concerning appellant's pending prosecution for another crime. All of the authorities cited hereinbefore in the discussion of appellant's first ground of appeal are applicable to this, appellant's second specification of error. (See *People* v. *Raleigh, supra*; *People* v. *Sanders, supra*; *People* v. *Peete, supra*; *People* v. *Sykes, supra*.) Additionally, the codefendant Wessilink gave a negative answer to each question concerning any connection of defendant Brown with another crime. There was no prejudicial error in overruling the objection or denying the motion to strike because the answer was favorable to the appellant. (*People* v. *Sorrentino*, 146 Cal.App.2d 149, 163 [303 P.2d 859] ; *People* v. *Bigelow*, 104 Cal.App.2d 380, 386 [231 P.2d 881] ; *People* v. *Deacon*, 117 Cal.App.2d 206, 211 [255 P.2d 98].) ■ Certainly, an instruction such as CALJIC Number 33, advising the jury of the limited purposes of such questions would have been advisable as to both the witness Pangle and the codefendant Wessilink. According to the record before us, no such instruction was requested by the defendants and as this is not an instruction which the court is required to give *sua sponte*, there was no reversible error in not giving it.

■ Appellant's third specification of error reads: "Was it error for the court to exclude evidence that the appellant Brown and his codefendant Wessilink were ready, willing and able to provide the State handwriting expert witness with samples of their handwriting?" The People called a handwriting expert as a witness who testified that he could not tell whether the handwriting on the receipt signed "Bob Cromer" or "Bob Cramer" was the same as the handwriting of defendant Wessilink. On direct examination he was asked no questions concerning the handwriting of appellant Brown nor was appellant Brown mentioned in connection with the receipt. On cross-examination counsel for appellant asked: "Q. And were you asked to make a comparison between the questioned document, I believe it is People's 9, and any handwriting of Mr. Brown? A. No I was not." Some additional questions were asked which are not pertinent to the point involved, whereupon the following occurred:

"Q. But you think that you would have a better chance of

saying whether or not, for example, the defendants wrote the questioned document, if you had ample exemplars of their handwriting? A. Of course.

"Q. And you wouldn't be adverse to making such an examination? A. No.

"Q. If the District Attorney were to request you to make it? A. It doesn't matter who requested me.

"Q. I didn't mean it that way——

"MR. KIMBALL: Your Honor, I would like to make one point clear in view of this last question. I cannot request the defendants give exemplars and it is not ethical for me to even talk with them, so I think Mr. Sheela might make such a request, but I would like to make it clear I can't do it ethically.

"MR. SHEELA: There was a request made for exemplars of handwriting.

"THE COURT: This is not the place to argue.

"MR. SHEELA: No, but, well, on behalf of the defendant Brown I will furnish any records that the District Attorney wants or any handwriting of his, if they wish to make such an examination.

"THE COURT: This is in the nature of argument, Mr. Sheela.

"MR. SHEELA: I made a statement, I am telling him we are ready, willing and able to comply, Your Honor."

Counsel for appellant then made an offer of proof which was heard in chambers out of the presence of the jury. Counsel asked permission to recall Brown to the stand and to prove that he had been willing at all times to furnish exemplars of his handwriting to the district attorney or to any person designated by the district attorney, and further that defendant was still willing to supply the exemplars. The court refused the offer of proof. There was no error committed as the witness had not testified regarding the defendant Brown's handwriting, hence an offer to furnish exemplars would have added nothing material to the case. The district attorney's remarks had been answered by counsel for the defendant who in open court and before the jury made the statement that the defendant would furnish exemplars of his handwriting and that he had always been willing to do so. It should also be noted that the offer made in chambers to furnish exemplars did not include an offer of proof of testimony or other evidence concerning the effect of the exemplars. Therefore it was, in our

opinion, an incomplete offer of proof. Under the circumstances the court's ruling was not error.

■ Appellant's fourth specification of error is entitled: "Was it error for the court to fail *sua sponte* to give the accomplice instructions?" Penal Code, section 1111, defines an accomplice in the following language:

"An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

Viewing the record in the light of Penal Code, section 1111, and viewing the evidence most favorably to defendant, we do not believe it could be said that as a matter of law the witnesses Whitney and Pringle were accomplices of defendant Brown.

However, conceding for the sake of argument that the witnesses Whitney and Pringle were accomplices and that the court erred by not giving an instruction on accomplices, it was not reversible error. In the first place there was no vital conflict between their testimony and that of the appellant. Secondly, most of the testimony of these two witnesses was corroborated. Third, the evidence essential to conviction did not come from the lips of the witnesses alleged to be accomplices. (*People* v. *Carswell*, 51 Cal.2d 602, 606 [335 P.2d 99].)

Judgment of conviction affirmed.

Griffin, P. J., and Shepard, J., concurred.